UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANTHONY RIGGINS, | : | Case No. 1:01-CV-503 |
| | : | |
| Plaintiff, | : | Judge Dlott |
| | : | |
| vs. | : | |
| | : | **PLAINTIFF'S MOTION FOR** |
| FORREST HUNT, et al., | : | **NEW TRIAL AND** |
| | : | **MEMORANDUM IN SUPPORT** |
| Defendants. | : | |

**MOTION**

Pursuant to Federal Rule 59(a) (1), Plaintiff respectfully moves for a new trial on the grounds that the verdict was against the manifest weight of the evidence and the trial was unfair to Plaintiff because of the prejudicial effect of Defendant's cross examination of Plaintiff coupled with Defendant's prejudicial demonstration during closing argument.

**MEMORANDUM IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 59 (a) (1), a new trial may be granted "in any action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Holmes v. City of Massillon,* 78 F.3d 1041, 1047 (6th Cir.), *cert. denied,* 519 U.S. 935, 117 S.Ct. 312, 136 L.Ed.2d 228 (1996). The Sixth Circuit recognizes three grounds for granting a new trial: (1) the verdict is against the weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party in some fashion as the result of the proceedings being influenced by prejudice or bias. *Conte v. General Houswares Corp.*, 215 F.3d 628 (6th Cir. 2000). "When a district court determines that a verdict is against the weight of the evidence, that court has a duty to grant a new trial in

order to prevent a miscarriage of justice." *Holmes* at 1047. However, "new trials are not to be granted on the grounds that the verdict was against the weight of the evidence 'unless that verdict was unreasonable.'" *Id*.

In this case, the jury's verdict was clearly against the weight of the evidence. Furthermore, the jury was prejudiced by Defendant's cross examination of Plaintiff and by Defendant's closing argument. The cross examination violated 404(b), 403 and court's ruling on the motions in limine and courts continued rulings sustaining objections, moving to strike, and warning counsel. In such circumstances, this Court would abuse its discretion if it failed to grant a new trial. Finally, the trial was unfair because defendants conducted a prejudicial demonstration during closing argument, contrary to the Court's instructions.

### A. Standard For Granting New Trial When Plaintiff Is Denied A Fair Trial Due To Prejudice

Plaintiff seeks a new trial because he was unfairly prejudiced by the defense attorneys' misconduct. For more than half a century, the Sixth Circuit has made it clear that "[c]ounsel should not introduce extraneous matter before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects and, where there is reasonable probability that the verdict of a jury has been influenced by such conduct, it should be set aside." *Twachtman v. Connelly*, 106 F.2d 501, 508-509 (6th Cir. 1939).

> In determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e. g. whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir. 1980).

Attorney misconduct that results in prejudice can be a basis for a new trial. *City of Cleveland v. Peter Kiewit Son's Co*. at 756. In *City of Cleveland*, the Sixth Circuit reversed the trial court's denial of a motion for new trial because it found the City's attorney's misconduct in commenting on the "deep pocket" and insurance of Defendant so pervasive throughout the trial that defendant was denied a fair trial. *Id*. at 758-760.

While the power to set aside a verdict for misconduct of counsel should be sparingly exercised, the determination of the proper extent of argument and conduct by counsel "rests primarily in the judicial discretion of the lower court." *Twachtman v. Connelly*, 106 F.2d at 509. However, although appellate courts are reluctant to grant a new trial for misconduct when the trial court refuses to, the Sixth Circuit has done so. *See*, *Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749 (6th Cir. 1980).

Furthermore, a trial court must conduct proceedings in a manner that permits only admissible evidence to be presented to the jury. FRE 103. Opposing counsel should assist by offering evidence in a fair and proper manner. FRE 103(c) provides:

> In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

A substantial right is affected by error that has a "material affect" upon or "substantially swayed" the deliberations of the jury. In contrast, harmless errors are those which do not affect the substantial rights of the party. Fed R. Civ. Proc. 61. The Sixth Circuit has described the standard for determining whether error is harmless or affects substantial rights as follows:

> Justice Antonin Scalia, then a circuit judge, discussed the harmless error doctrine in the context of error in admission of evidence, in *Jordan v. Medley*, 711 F.2d 211 (D.C.Cir. 1983). He wrote: We must ask, finally, whether wrongful

> admission of the testimony affected appellant's "substantial rights," see 28 U.S.C. § 2111 (1976); Fed.R.Evid. 103; Fed.R.Civ.P. 61; or was instead harmless error. That inquiry involves an assessment of the likelihood that the error affected the outcome of the case. See *United States ex rel. D'Agostino Excavators, Inc. v. Heyward Robinson Co.*, 430 F.2d 1077, 1083 (2d Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). As the Supreme Court has described the test: "[I]f one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, see *id.*, at 763, 66 S.Ct. at 1247; *Carona v. Pioneer Life Ins. Co.*, 357 F.2d 477, 480 (5th Cir. 1966); and the centrality of that issue to the ultimate decision, see *Charter v. Chleborad*, 551 F.2d 246, 249 (8th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 128 (1977).

*Schrand v. Federal Pacific Electric Co.,* 851 F.2d 152, 157 (6th Cir. 1988). In that case, a plaintiff verdict in an age discrimination action was reversed and remanded for new trial based on the erroneous admission of the testimony of two workers who were also separated from the defendant company. The Court held in that case that the evidence was not harmless as it was "arguably the…strongest evidence in plaintiff's favor at trial" and it was a close case. *Id* at 157. When that standard is applied to the actions of defense counsel and the admission of the demonstration in this case it is clear that a substantial right of plaintiff has been affected by the demonstration during the defendants' closing argument and that a mistrial should be declared.

Even a single misstep by an attorney is so destructive to a party's right to a fair trial, it will constitute reversible error. *U.S. v. Solivan*, 937 F.2d 1146, 1156-1157 (6th Cir. 1991) (prosecutor's single remark in closing argument "to send a message," although isolated, was so prejudicial to deny the defendant a fair trial). Extraneous and highly inflammatory closing arguments could very well influence a jury's verdict by prejudicing the jury against a party. *Eagan v. CSX Transportation, Inc,* 271 F. Supp.2d 993 (E.D.

Mich. 2003) (counsel's vituperative and disparaging remarks during closing argument are prejudicial and resulted in a new trial).

> **B.  This Court Should Grant A New Trial Because The Defense Attorneys' Conduct Was So Unfairly Prejudicial To Plaintiff's Right To A Fair Trial**
>
> **1.  Defense Counsel's Closing Argument was Prejudicial**

On November 20, 2003, after closing arguments, Plaintiff orally moved for a mistrial.[1] Plaintiff moved for a mistrial on three grounds: 1) the demonstration conducted in defendants' closing argument was evidence and not argument; 2) the demonstration contained facts not in evidence; and 3) the demonstration was prejudicial. Plaintiff renewed his motion for a mistrial after the jury's verdict was read on November 21, 2003. Plaintiff subsequently filed a supportive memorandum (Doc. 100). Plaintiff requests that the Court grant a new trial because the Defendants' closing argument was unfairly prejudicial and affected Plaintiff's substantial rights to a fair trial.

On November 20, 2003 during Defendants' closing argument Plaintiff objected, twice, to the demonstration that Defendants, Defense counsel Tracy Hoover, and Lt. Distel portrayed to the jury. This court overruled each objection, permitting the demonstration, as long as Mrs. Hoover, who was delivering the closing argument, directed the actions of the participants. While the demonstration began with Mrs. Hoover directing the movements of the participants, it quickly turned from argument to evidence when all Defendants and Mr. Hoover acted out their version of what happened without direction from Mrs. Hoover.

---

[1]  Plaintiff's motion is currently pending. The arguments made there in (Doc. 100) are incorporated herein by reference.

5

Plaintiff proffered into the record a description of the actions, which is summarized here:

Defendants Hunt, Gannon, and Wells, witness Lt. Distel, and attorney Tracy Hoover demonstrated the critical events in this case during defense's closing argument. Their actions went far beyond the narrative by Mrs. Hoover. After Mrs. Hoover told each person to come to the well of the courtroom, the following actions occurred simultaneously. Mr. Hoover, acting as Mr. Riggins, stood in the "cell" as laid out on the floor of the well of the courtroom and faced the jury. He shook his head, mouthed words, acted violent and angry and grabbed Mr. Hunt's neck with both hands and pulled Mr. Hunt toward him.

Mr. Hunt stood in front of Mr. Hoover with his back to the jury. As Mr. Hoover grabbed Mr. Hunt, Mr. Hunt tucked his chin to his neck and knocked his hat off. Mr. Hunt did not pantomime that he hit his man-down and used his phone. He did not mouth words.

Mr. Wells was standing with his back to the jury, to the right of Mr. Hunt. As Mr. Hoover grabbed Mr. Hunt, Mr. Wells stepped "into the cell" by stepping to his right and forward. Mr. Wells did not use Plaintiff Ex. 14 (PR 24) or pantomime using a PR 24. He did not draw a PR 24 or use it in a "flat chop" maneuver on Mr. Hoover. Instead, Mr. Wells grabbed Mr. Hoover's left arm with both of his hands. Mr. Hoover's right arm came away from Mr. Hunt.

Immediately after Mr. Wells stepped forward "into the cell" Mr. Gannon, standing with his back to the jury and to the left of Mr. Hunt, came into the cell, walking forward, not sideways with his back to Mr. Hoover. He also grabbed Mr. Hoover's arms. Mr. Gannon and Mr. Wells together pulled Mr. Hoover and wrested him to the ground. None of these 3 kept their bodies within the blue taped outline of the 9' x 6' "cell." Mr. Gannon and Mr. Hoover's bodies were wrestling and laying over the taped outline of the bed.

After Mr. Gannon entered the cell, Mr. Hunt stepped forward and entered the "cell." He bent over and pantomimed cuffing Mr. Hoover. The entire demonstration was not timed. There was no indication during the demonstration as to when the door opened. Based on how quickly Mr. Wells entered the cell, the demonstration portrayed the cell door opening much faster than Plaintiff Exhibit 21 (videotape).

This demonstration was evidence since the actions were not limited to the direction of defense counsel. Furthermore, the demonstration did not conform to the evidence at trial. Defendant Hunt did not testify during trial so all of his un-narrated

6

actions were evidence not submitted to cross examination. Defendant Hunt did not use his phone and man-down, contrary to Defendant Well's testimony at trial. Defendant Wells did not use a PR-24 in the demonstration, contrary to his sworn testimony. Mr. Hoover's actions of shaking his head, mouthing words, acting violent and angry were not based on evidence in the record.

Finally, the shock of the demonstration taking place a few feet from the jurors, unexpectedly, violently, and loudly, added to the prejudice.

The demonstration has irreparably harmed Plaintiff by the impermissible demonstration. The defense counsel did not limit her presentation to the evidence in the record. By utilizing Hunt in the demonstration she in effect let him testify without subjecting him to cross-examination after the record was closed. In short, what the jury witnessed was a defense version that simply was untethered to the record and highly prejudicial. There was no warning to the court or plaintiff counsel about the demonstration. There was no opportunity by plaintiff counsel to voir dire the demonstration. Such an "argument" by defense counsel directly violated the admonition of FRE 103(c).

Defendants and their attorney's actions during closing were so prejudicial, they could not be cured by the supplemental instruction given to the jury at the eleventh hour of their deliberations. At 12:20 p.m. on November 21, 2003 the Court gave a supplemental instruction to the jury.

> Members of the jury, during Defendants' closing argument, there was a demonstration by the Defendants and their counsel. I have determined that the demonstration should be struck from the record. Therefore, you must disregard the demonstration during your deliberations, and you may not permit the demonstration to influence your verdict in this case.

> Do not interpret this instruction as any indication of how I think the case should be decided.

The jury reached their defense verdict within an hour after the instruction was given. Plaintiff then renewed his motion for a mistrial. The curative instruction was simply too little too late to cure the prejudice of the demonstration. *See, United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991) (twenty minute delay in curative instruction was too late to remedy improper argument by prosecutor); *Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 759 (6th Cir. 1980) ("the curative instructions which the trial court eventually chose to give were plainly, 'not sufficient to removed the probability of prejudice.'")

> "… the bench and bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information, … cautionary instructions will have little, if any, effect in eliminating the prejudicial harm."

*Id*. at 759 (quoting from *O'Rear v. Fruehauf Corp*., 554 F. 2d 1304, 1309 (5th Cir. 1977).

The fact is, the demonstration was of such a shocking and powerful nature that no instruction could cure it. This Court repeatedly ruled that this would not be a "trial by ambush." This instruction was ignored when Defense counsel turned her argument into a presentation of unsworn, unexamined evidence. What resulted was not a trial by ambush, but a farce. This misconduct resulted in Plaintiff being deprived of his substantial right to a fair trial. Therefore a new trial should be granted.

### 2. Defense Counsel's Cross Examination of Plaintiff Violated The Court's Evidentiary Rulings And Resulted In Unfair Prejudice

In addition to defense counsel's misconduct during closing argument, Counsel's actions rose to misconduct and prejudicial error during Plaintiff's cross examination. Plaintiff filed a motion in limine seeking to exclude evidence of Plaintiff's RIB record as inadmissible under FRE 404 (b) and unfairly prejudicial under FRE 403. (Doc. 75).

The Court granted the motion. The Court ruled before trial that RIB convictions could be admitted only to the extent they showed Mr. Riggins had provoked officers into responding in the past. No such evidence ever existed. Yet defense counsel raised on cross examination prohibited evidence or RIB convictions, and on one occasion evidence of attacking COs which evidence never existed.

Q. Okay. You have also manipulated to the point where you can go out of Lucasville to a hospital quite a few times, haven't you?

Ms. Branch:   Objection, Your Honor.

The Court:   … Sustained.

(Tr. p. 4, l. 10)[2]

Q. You have done a lot of drastic things at SOCF to end up being at SOCF, haven't you?

Ms. Branch:   Objection.

Mr. Hoover:   I'll rephrase, you Honor

(Tr. pp. 8-9)

Q. One time you got locked up for attacking COs, too, didn't you?

Ms. Branch:   Objection. Move to strike. This is the subject of the motions in limine.[3]

The Court:   Sustained.

(Tr. pp. 9-10)

---

[2] Transcript Day 2 of Trial -- Cross-Examination of Anthony Riggins.

[3] Additionally, there is no evidence Riggins was ever charged with or convicted of "attacking COs." Counsel lacked a good faith belief when asking this question and pursuing this further.

9

Q. I mean, you have never stopped. You break rules no matter where you go. No matter where you go. No matter what is done to you, you persisted in constantly violating rules and regulations at the penal institutions, haven't you?

    Ms. Branch:    Objection.

    The Court:    Sustained.

Q. Sir, this incident with the tray is not your first incident with a tray, either, is it? I mean you have had numerous tickets here for violations with trays, haven't you?

    Ms. Branch:    Objection.

    The Court:    Sustained.

(Tr. pp. 10, l. 25 – p. 11, l.12)

Q. You have actually been found guilty of manipulation those trays and using them as weapons before, haven't you?

    Ms. Branch:    Objection. Move to strike.

    The Court:    Sustained. And the Court will instruct the jury to disregard the question of the attorney.

(Tr. p. 12, l.14)

Q. Well, I think a man desperate, such as yourself, would do about anything to get out of that place.

    Ms. Branch:    Objection. Move to strike.

    The Court:    I'm going to strike that question. Mr. Hoover I don't want any more questions like that.

Q: Well, with your history of lying and manipulation, sir –

    The Court: Mr. Hoover.

    Ms. Branch:    Objection.

    The Court:    The Court will instruct the jury to disregard the statement made by the attorney. That's his characterization. It's not in evidence and should not be before the jury.

(Tr. 22, l. 14)

    The entire re-cross examination consisted of the following:

Q.    Sir, it really didn't matter what kind of food was on that tray. You were wanting COs up there to where you could cause a disturbance, weren't you?

    Ms. Branch:    Objection.

A.    No, I wasn't.

Q.    You caused your disturbance, and you got to take your ride. You got to go to the --

    The Court:    Mr. Hoover.

    Mr. Hoover:    No further questions.

(Tr. 25, l. 1)

    While each objection was sustained, and some questions stricken, and counsel was even warned to stop, the misconduct of asking prohibited questions continued. The overall cumulative effect was prejudicial, especially in context of the entire cross examination, which was rather short. The cross examination was so prejudicial the jury was left with no choice but to disbelieve the Plaintiff. Since the jury found Plaintiff lacked credibility, Plaintiff could not win his case (see argument below). Therefore the cross examination was so prejudicial that a new trial should be granted.

11

### 3. The Cumulative Effect Of Defense Counsels' Misconduct Was Prejudicial

The court should look at the totality of the circumstances when weighing whether to grant a new trial, including whether it was a close case. *City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir. 1980). In *City of Cleveland,* the Court specifically found that counsel's improprieties were "even more significant when viewed in light of the close nature of this case." *Id*. 759. "'[W]here the factual questions to be determined are so apparently in near equipoise the incidents of a trial which tend to arouse passion or prejudice should be closely scrutinized.'" *Id.* (internal citation omitted). In the case at bar the evidence in the case was close, as was evidenced by the jury's deliberation of 10 hours. The evidence portion of the trial lasted approximately one full trial day, yet the jury deliberated for 10 hours over two days. When the case as close as it was in this case, defense counsel's the misconduct is even more prejudicial.

The Court should also weigh the fact that Defense Counsel's actions in cross examination and in the closing demonstration were deliberately in violation of a prior Court ruling excluding Plaintiff's RIB record unless is showed evidence of prior acts of provoking officers into a confrontation. The Court's ruling on the motion in limine occurred two days before trial. Additionally, Plaintiff raised the topic before jury selection and the Court cautioned counsel not to mention anything subject to a motion in limine during voir dire or jury selection.

No such evidence existed of Plaintiff having provoked an officer in the past, therefore Defendants did not cross examine Mr. Riggins on this topic. Instead, on cross examination of Mr. Riggins, Mr. Hoover asked questions that were ruled inadmissible. The Court repeatedly struck Mr. Hoover's questions, eventually instructed the jury to

disregard and finally admonished Mr. Hoover. However, Mr. Hoover continued to disregard the Court's ruling to such an extent that his entire re-cross examination consisted of objectionable questions.

An attorney's misconduct that is directly and deliberately contrary to a Court's ruling should result in a new trial. *Igo v. Coachmen Industries, Inc.*, 938 F.2d 650, 653 (6th Cir. 1991) (attorney deliberately referenced evidence which the Court excluded when ruling on a prior motion in limine was misconduct); *Harbin v. Interlake Steamship Co.*, 570 F.2d 99, 106 (6th Cir. 1978) (attorney's comment in argument that his client was not a "bad guy" resulted in a new trial because the attorney had successfully moved to exclude opposing counsel from eliciting evidence of his client being a bad guy).

### C. Standard For Granting New Trial When The Evidence Is Against The Manifest Weight Of The Evidence

The district court is afforded very broad discretion in ruling on new trial motions and the appellate courts will defer a great deal to its exercise of this discretion. *Cathey v. Johns-Mansville Sales Corp.*, 776 F.2d 1565 (6th Cir. 1985); Wright, Miller & Kane, Federal Practice and Procedure Civil 2nd § 2818 (1995). When the Court finds the verdict is unjust, the jury's verdict must be vacated.

> A motion for new trial is addressed to the sound discretion of the Court, and **should be granted if it will do substantial justice**. The trial judge has a responsibility to weigh the evidence and to set aside the jury's verdict when, in [her] conscientious opinion, the verdict is contrary to the weight of the evidence.

*Cathey v. Johns-Mansville Sales Corp.*, 776 F.2d 1565, 1572-73 (6th Cir. 1985) (emphasis added) (quoting *Cecil Corley Motors Co. v. Gen. Motors Corp.*, 380 F. Supp. 8419, 859 (M.D. Tenn. 1974)).

The verdict in this case was clearly against the evidence adduced at trial. In this case, Plaintiff presented substantial credible evidence that Defendant's actions violated his constitutional rights; the jury's finding to the contrary is unreasonable as a matter of law and fact. A new trial is the appropriate corrective measure.

**D.     This Court Should Grant A New Trial Because The Verdict Is Against The Weight Of The Evidence**

Plaintiff testified, cross examined Defendants Wells and Gannon, and presented uncontradicted testimony from Lt. Distel, Warden Carter and health care administrator Mona Parks. Defendant Hunt did not testify, nor did Wells or Gannon, except on cross examination by Plaintiff. The only witness defendants called was inmate Daryle Harris.

The majority of the facts were uncontradicted. On May 12, 2001, Anthony Riggins was in J-3 cell 71 when he received the wrong food tray. He spoke with Officer Carole Chapman and asked her for a white shirt. He had just completed his shower and was still finishing his grooming when he saw these three men standing in front of his six foot wide cell: Defendants Hunt, Gannon, and Wells.

Hunt had taken Carole Chapman's equipment, her PR-24, her man-down, her phone and he told her to work the booth. Wells, who was just in the booth to enjoy the air conditioning, joined his friend Hunt. And Gannon abandoned his work location in violation of post orders and left all of the inmates unsupervised on the South side of J3 in order to join the posse and confront Riggins.

Hunt shouted to Riggins, "Give me the fucking tray." Riggins replied with his own gutter talk and even told Hunt to suck his dick. Hunt started tossing cups and pulling Riggins jumpsuit off the bars so as not to block the door from opening. Hunt reached in to try and pull the bedspread with the tray on it. Riggins asked for a white

14

shirt and put the tray on the back shelf. The whole block was riled up. The inmates were loud. They knew this conduct was against the rules. They knew that white shirts are supposed to deal with situations like this. All eyes were on these three men. Hunt talked into his phone. He claimed that Lt. Distel has instructed him to "go get the tray." Hunt called Chapman in the booth. "Open Cell 71."

None of these facts were contradicted by Wells or Gannon. Wells and Gannon contradict each other, however, when they describe what happened after the door opens. Wells claimed he came in swinging his PR-24 and struck Riggins in the right collarbone, while Riggins removed his left hand from the cell bars, but kept his right arm through the bars. Wells then tackled Riggins, all by himself, and lifted him up and threw him to the ground.

Gannon, on the other hand, says he walked behind Hunt and then entered the cell after Wells, with his back to Riggins, Wells, and Hunt. He claimed both of Riggins' arms where through the bars. Gannon then grabbed Riggins' left arm and pulled him to the ground. He never saw Wells wield his PR-24 and hit Riggins.

Not only do Wells and Gannon contradict each other's version of what happened inside the cell, their claims are impossible given the uncontradicted evidence of how the door will not open if it is obstructed. Wells testified Riggins' left arm was through the bars four to six inches from the opening door edge. Gannon testified Riggins' left arm was through the bar when he came in after Wells. Neither Wells nor Gannon could fit in a four to six inch space. Wells agreed on cross examination he would need at least a

15

foot.[4]  Therefore, Riggins arms were not through the bars when the door opened.  As this Court instructed the jury, when a witness' credibility is questioned then all of his testimony may be ignored.

So the only credible evidence of what happened when the door opened was from Riggins, who testified that when the door opened Hunt rushed in with his PR-24, while Wells and Gannon followed.  Riggins raised his left hand to deflect a blow from Hunt's PR-24 and dodged him.  Hunt went down toward the back of the cell and his man down alarm went off.  Riggins tried to get out of the cell.  He was frightened.  He thought they were trying to kill him.  He was struck by PR-24s, kicked, taken to the floor as all four men tangled in the three foot by six foot open area next to the bed.

It is also uncontradicted that Riggins was seriously hurt.  Riggins had a broken finger, a broken clavicle and a punctured lung, bruises.  Riggins was sent to OSU, then to the correctional medical center, and back to the SOCF infirmary to recover.

The major fact that was hotly disputed by Riggins and Gannon and Wells was whether Riggins grabbed Hunt's head and neck through the bars.  This fact is critical to the defense.  If Riggins grabbed Hunt then Plaintiff's actions could be seen as a reasonable threat perceived by defendants which could justify their use of force.

However, Riggins denied he ever reached through the bars.  He can offer no other direct evidence in support other than his own testimony, except the use of force reports stated that Riggins passed a CVSA (voice stress analysis) and a polygraph when he stated

---

[4]  At first Wells said he was 5 inches wide.  However, after stepping down off the stand and standing at the entrance of the "cell" as laid out on the floor, and confronted with the measuring tape, he conceded 12 inches was more likely the opening he would need to fit through.

16

he did not reach through the bars and grab Hunt.[5]  Indirect evidence supports Riggins. Lt. Distel and Warden Carter testified that if his arms were through the bars when the door opened the door would stop and not even leave a bruise on Riggins.  This testimony was not contradicted by defendants.

      Wells' and Gannon's testimony that Riggins did reach through the bars is contradicted by three pieces of evidence.  First, no one tried to break Riggin's alleged hold on Wells.  Wells testified that when Hunt was grabbed he reached for his phone and called to open cell 71 and he reached for his man-down.  PX 1008.  Hunt did not break Riggins hold or squat down out of his reach or back up.  Nor did Wells or Gannon attempt to remove Riggin's arms or pull Hunt away from the bars.  Wells, the PR-24 instructor, did not use the club to jab at Riggins.  Wells testified he wouldn't use the PR-24 to jab anyone, but the PR-24 manual explains how to jab suspects.  PX 1015.  Wells testified he "froze" which, as his counsel pointed out, was contrary to his marital arts training.  The complete failure to get Hunt away from Riggins hold is not credible.  Even more incredible is Wells' testimony that Hunt was reaching for his phone and man-down while his face was being smashed into the bars without ever fighting back.  Therefore Riggins never really did grab through those bars.

      The second piece of evidence which discredits defendants' claim Riggins grabbed through the bars is the door being unable to open, as was discussed earlier.

      Third, there was no blood on the bars.  See PX 1023.  Lt. Distel testified he took photos of where all the blood was at the scene.  The photograph shows where the blood

---

[5] Defendants object to this evidence, however, defendants never raised the polygraph information as a grounds for objecting to the use of force report, either in their motion in limine, or at the pre-trial conference or at trial.

was: in the cell and on the range floor to the right of the cell opening. The photograph also shows where the blood is not: on the range floor where Hunt was allegedly standing when his face was smashed into the bars, bleeding heavily.

Therefore, the manifest weight of the evidence shows that Riggins did not reach through the bars and grab Hunt. Therefore the defendants were not justified in using force.

The other major element of the use of force case that was in dispute was whether defendants caused the harm to plaintiff. Riggins testified that Hunt struck him with a PR-24 on his left hand as he tried to block the blow. Hunt did not testify so this was not disputed. Riggins also said all three defendants struck him, hit him and used force on him in the cell. Wells admitted striking Riggins with a PR-24 right where the clavicle is broken. Wells also admitted to lifting Riggins and taking him to the floor. Gannon admitted to pulling on Riggins with such force that they both fall down in the small cell area.

Defendants claimed that their force did not cause injuries. They brought in only one witness in their case in chief. And the witness was only for this point. Inmate Daryle Harris testified that he was in the porter closet in J-2 and saw two defendants – Hunt and Wells escort Riggins into J-2. He then saw Riggins flail around in the strip search cell. Harris' testimony was wrong which is why he was not even mentioned in defendants' closing argument. Lt. Distel testified that he sent two other officers to escort Riggins to J-2. Wells testified he stayed in the cell after Riggins was escorted out and then went to the hospital. See PX 1010. Bates page 2. Therefore, the manifest weight of the evidence shows that Riggins' injuries were caused by the defendants.

When ruling on a new trial motion based on the evidence being against the manifest weight of the evidence, the court "may compare the opposing proofs and weigh the evidence." *Toth v. Yoder Co.*, 749 F.2d 1190, 1997 (6th Cir. 1984). "It is the duty of the judge to set aside the verdict and grant a new trial, if [s]he is of the opinion that the verdict is against the clear weight of the evidence." *Bruner v. Dunaway* 684 F.2d 422 (6th Cir. 1982). When this Court compares the opposing proof in this case and weighs the evidence, there can only be one conclusion: the verdict for the defendants was against the manifest weight of the evidence. When a verdict is so unreasonable, a new trial must be granted. *Holmes*, 78 F.3d at 1047. Therefore, for justice to be done, this Court must order a new trial.

**IV. Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that a new trial be granted. Plaintiff requests a new trial date prior to Mr. Hunt's being called to a one year tour of duty in the Ohio National Guard, which he testified[6] may come in December 2003 or January 2004.

                                                        Respectfully submitted,

                                                        s/ Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
Alphonse A. Gerhardstein (0032053)
Attorney for Plaintiff
LAUFMAN & GERHARDSTEIN
617 Vine Street, Suite #1409
Cincinnati, Ohio 45202
(513) 621-9100

---

[6]    Hunt Deposition p. 49 l. 12- P. 50 l. 13.

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 5, 2003, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

                                                s/ Jennifer L. Branch
                                                Attorney for Plaintiff